No. 23-13914
*(consolidated with Nos. 23-13916 & 23-13921)*

In the

# United States Court of Appeals
## for the Eleventh Circuit

Alpha Phi Alpha Fraternity, Inc., et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant*.

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05337 — Steve C. Jones, *Judge*

## REPLY BRIEF OF
## THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

No. 23-13916
*(consolidated with Nos. 23-13914 & 23-13921)*

In the
# United States Court of Appeals
## for the Eleventh Circuit

Coakley Pendergrass, et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:21-cv-05339 — Steve C. Jones, *Judge*

## REPLY BRIEF OF
## THE SECRETARY OF STATE OF GEORGIA

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

No. 23-13921
*(consolidated with Nos. 23-13914 & 23-13916)*

In the

# United States Court of Appeals
## for the Eleventh Circuit

---

Annie Lois Grant, et al.,

*Plaintiff-Appellees*,

v.

Secretary of State of Georgia,

*Defendant-Appellant*.

---

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:22-cv-00122 — Steve C. Jones, *Judge*

---

## REPLY BRIEF OF
## THE SECRETARY OF STATE OF GEORGIA

---

Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for the Secretary of State of Georgia*

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities, in addition to those listed in the Secretary's opening brief, may have an interest in the outcome of this case:

Anderson, Carol, Amicus;

Bird, Brenna, Counsel for Amicus;

Bonta, Rob, Counsel for Amicus;

Bowen, Brennan, Counsel for Amicus;

Brachman, Paul D., Counsel for Amicus;

Brennan Center for Justice, Amicus;

Brown, Anthony G., Counsel for Amicus;

Buchanan, Ryan K., Counsel for Amicus;

Burton, Orville Vernon, Amicus;

Campbell, Andrea Joy, Counsel for Amicus;

Clark, Charity R., Counsel for Amicus;

Clarke, Kristen, Counsel for Amicus;

Commonwealth of Massachusetts, Amicus;

Constitutional Accountability Center, Amicus;

Dauber, Michael S., Counsel for Amicus;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Ellison, Keith, Counsel for Amicus;

Ferguson, Robert W., Counsel for Amicus;

Fiddell, Eugene R., Counsel for Amicus;

Fitch, Lynn, Counsel for Amicus;

Ford, Aaron D., Counsel for Amicus;

Frazzette, Sean, Counsel for Amicus;

Frey, Aaron M., Counsel for Amicus;

Gans, David H., Counsel for Amicus;

Geiger, Soren, Counsel for Amicus;

Gorod, Brianne J., Counsel for Amicus;

Hilgers, Michael T., Counsel for Amicus;

Holtzman Vogel, PLLC, Counsel for Amicus;

Hughes, Aileen Bell, Counsel for United States;

James, Letitia, Counsel for Amicus;

Jennings, Kathleen, Counsel for Amicus;

Jessurun, Anna K., Counsel for Amicus;

Keyssar, Alexander, Counsel for Amicus;

Knudsen, Austin, Counsel for Amicus;

Kobach, Kris W., Counsel for Amicus;

Kousser, J., Morgan, Amicus;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

LaCour Jr., Edmund G., Counsel for Amicus;

Lopez, Anne E., Counsel for Amicus;

Marshall, Steve, Counsel for Amicus;

Mayer Brown LLP, Counsel for Amicus;

Miller, Laura E., Counsel for Amicus;

Moody, Ashley, Counsel for Amicus;

Morrisey, Patrick, Counsel for Amicus;

Murrill, Liz, Counsel for Amicus;

National Republican Redistricting Trust, Amicus;

Neronha, Peter F., Counsel for Amicus;

Paul, Weiss, Rifkind, Wharton & Garrison LLP, Counsel for
    Amicus;

Paxton, Ken, Counsel for Amicus;

Phatak, Ashwin P., Counsel for Amicus;

Platkin, Matthew J., Counsel for Amicus;

Raoul, Kwame, Counsel for Amicus;

Reyes, Sean D., Counsel for Amicus;

Rokita, Theodore E., Counsel for Amicus;

Rosenblum, Ellen F., Counsel for Amicus;

Rothfield, Charles A., Counsel for Amicus;

*Alpha Phi Alpha Fraternity v. Sec'y of State of Ga.*, No. 23-13914;
*Pendergrass v. Sec'y of State of Ga.*, No. 23-13916;
*Grant v. Sec'y of State of Ga.*, No. 23-13921

Rudensky, Yurij, Counsel for Amicus;

Schwalb, Brian L., Counsel for Amicus;

Stein, Joshua H., Counsel for Amicus;

Tong, William, Counsel for Amicus;

Torchinksy, Jason, Counsel for Amicus;

Trento, Andrea W., Counsel for Amicus;

Tulin, Leah J., Counsel for Amicus;

Underwood, Barbara D., Counsel for Amicus;

Vale, Judith N., Counsel for Amicus;

Valerio-Esene, Amanda, Counsel for Amicus;

Van Nile, Caroline S., Counsel for Amicus;

Weiser, Philip J., Counsel for Amicus;

Wilson, Alan, Counsel for Amicus;

Wydra, Elizabeth B., Counsel for Amicus;

Yale Law School Supreme Court Clinic, Counsel for Amicus.


/s/ *Stephen J. Petrany*
Stephen J. Petrany

# TABLE OF CONTENTS

**Page**

Table of Authorities ......................................................................... vi

Introduction ..................................................................................... 1

Argument ......................................................................................... 3

    I.   Plaintiffs failed to prove a § 2 violation. ............................... 3

        A.  Plaintiffs did not prove that they have lesser
           opportunity "on account of race." ..................................... 4

           1.   To prove vote dilution "on account of race," Plaintiffs
                must prove racial, not partisan, bloc voting. ............. 4

           2.   The evidence here shows ordinary partisanship, not
                racial bloc voting. .................................................... 15

        B.  Plaintiffs repeat the district court's errors in evaluating
           the totality of the circumstances. .................................. 19

    II. The district court's race-based remedy is not justified by
        present-day circumstances. ................................................ 25

        A.  Prophylactic legislation must reflect current conditions.
           .……………………………………………………….27

        B.  Plaintiffs' version of § 2 is not a congruent and
           proportional response to intentional discrimination. ... 34

    III.Section 2 cannot be enforced through private action. ......... 35

        A.  The Act's text and structure show that Congress did not
           create a private cause of action. ..................................... 35

        B.  Plaintiffs cannot proceed through § 1983. .................... 41

Conclusion ...................................................................................... 44

v

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Perez,*
    585 U.S. 579 (2018) ...................................................... 34

*Alexander v. S.C. State Conf. NAACP,*
    144 S. Ct. 1221 (2024) ......................................6, 28, 31

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ...................................... 35, 39-40

*Allen v. Milligan,*
    599 U.S. 1 (2023) ....................................12, 21, 26, 33

*Allen v. State Bd. of Elections,*
    393 U.S. 544 (1969) .........................................37, 40

*Ark. State Conf. NAACP v. Ark. Bd. of Apportionment,*
    86 F.4th 1204 (8th Cir. 2023)..............................35-37, 39, 42, 44

*Baird v. Indianapolis,*
    976 F.2d 357 (7th Cir. 1992) ..................................... 14

*Bd. of Trs. Of Univ. of Ala. v. Garrett,*
    531 U.S. 356 (2001) ................................................ 28

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ..........................................19, 24

*Bruesewitz v. Wyeth LLC,*
    562 U.S. 223 (2011) ................................................ 39

*City of Boerne v. Flores,*
    521 U.S. 507 (1997) ...................................... 27-28, 42

*Egbert v. Boule,*
    596 U.S. 482 (2022) .........................................35, 40

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ................................................................... 38

*Fox v. Vice*,
    563 U.S. 826 (2011) ................................................................... 38

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
    503 U.S. 60 (1992) ..................................................................... 39

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) ............................................................. 41-43

*Goosby v. Town Bd. of Hempstead*,
    180 F.3d 476 (2d Cir. 1999) ..................................................... 13

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ................................................... 4

*Health & Hosp. Corp. v. Talevski*,
    599 U.S. 166 (2023) ................................................................... 43

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ..................................................................... 5

*League of Utd. Latin Am. Citizens v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ..................................................... 13

*League of Utd. Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ............................................................... 4, 22

*Morse v. Republican Party of Virginia*,
    517 U.S. 186 (1996) ................................................................... 40

*Nat'l Ass'n of the Deaf v. Florida*,
    980 F.3d 763 (11th Cir. 2020) ................................................... 27

*Nev. Dep't of Hum. Res. v. Hibbs*,
    538 U.S. 721 (2003) ............................................................27, 42

*Nipper v. Smith*,
    39 F.3d 1494 (11th Cir. 1994) .................................................. 14

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) ................................................................ 40

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ................................................................ 27

*Shelby County v. Holder*,
    570 U.S. 529 (2013) ........................................................... 29-30

*Singleton v. Merrill*,
    582 F. Supp. 3d 924 (N.D. Ala. 2022) ...................................... 13

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966) ................................................................ 42

*Students for Fair Admissions, Inc. v. President &*
    *Fellows of Harvard College*,
    600 U.S. 181 (2023) ................................................................ 31

*Tennessee v. Lane*,
    541 U.S. 509 (2004) ................................................................ 29

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ......................................5, 8-12, 16-17, 25, 32

*United States v. Marengo Cnty. Comm'n*,
    731 F.2d 1546 (11th Cir. 1984) ..........................................14, 20

*Uno v. City of Holyoke*,
    72 F.3d 973 (1st Cir. 1995)................................................. 13-14

*Vaughan v. Lewisville Ind. Sch. Dist.*,
    62 F.4th 199 (5th Cir. 2023)..................................................... 38

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................ 20

*Whitcomb v. Chavis*,
   403 U.S. 124 (1971) .................................................. 8-9, 12

*In re Wild*,
   994 F.3d 1244 (11th Cir. 2021) ...........................................35, 37

*Wis. Legislature v. Wis. Elections Comm'n*,
   595 U.S. 398 (2022) ...........................................27, 31

*Wright v. Sumter Cnty. Bd. Elections & Registration*,
   979 F.3d 1282 (11th Cir. 2020) ................................................ 14

## Statutes

20 U.S.C. § 1232g.................................................................. 42

42 U.S.C. § 1988.................................................................. 38

52 U.S.C. § 10301.................................................. 4-5, 19, 22

52 U.S.C. § 10302.................................................36, 43

52 U.S.C. § 10308.................................................. 43

52 U.S.C. § 10310.................................................. 37

## Other Authorities

Ga. Sec'y of State, *Data Hub – November 8, 2022*
   *General Election*, https://bit.ly/3wbMPoi .................................. 23

Model Penal Code § 2.02.................................................. 7

Model Penal Code § 2.03.................................................. 7

Restatement (Second) of Torts § 8A .............................. 7

Restatement (Second) of Torts § 9.................................. 7

S. Rep. No. 97-417 (1982) ...................................... 38-39

# INTRODUCTION

The Voting Rights Act broke regimes where black voters and candidates genuinely lacked equal access and political opportunity.  Now, Plaintiffs try to mangle it into a partisan tool to ensure more majority-Democrat districts in Georgia's legislative maps.  That demeans the lofty goals of the Act, it tramples on state sovereignty, it traps federal courts in partisan disputes, and it would violate the Constitution.

Section 2 of the Voting Rights Act ensures that voters of different races have equal opportunity to participate in elections and elect candidates of their choice.  It does not guarantee electoral success, and it certainly does not guarantee an advantage to one political party simply because it is the preferred party of minority voters.  Yet under Plaintiffs' view of § 2, anywhere black voters vote cohesively (which is everywhere), lose elections (which is everywhere Republicans predominate), and *could* have additional majority-black districts (which is everywhere that politicians draw maps to their own political advantage), they are entitled to them.

That view of § 2 is wrong as a legal and constitutional matter. The statute does not ensconce a particular political party into a privileged position.  If *all* Democrats, of any race, face the same

1

obstacle to electoral success—they happen to be in the political minority—that is not race-based vote dilution.

And that is plainly true in Georgia, which is a paradigm example of voter equality. Georgia elects black officials left and right. Voting is easy and virtually everyone is registered. Black and black-preferred candidates have no problems winning primary nominations. Black and black-preferred candidates obtain federal and state office at rates that would be *impossible* if black voters lacked equal opportunity. No objective observer could find that black voters lack the same political opportunity as everyone else.

Plaintiffs and the district court point to nothing that suggests black voters lack equal opportunity in Georgia. Voting patterns show partisan divergence, not racial causation. The district court could not locate any discriminatory activity by Georgia in decades, relying instead on centuries-old history. There are no barriers to voting. Campaigns are not characterized by racial appeals. Black candidate success is extensive.

Indeed, if Georgia's maps are illegal under § 2, that statute is unconstitutional. Congress cannot require explicitly racial remedies for non-racial injuries without, at the very least, putting forth evidence that it is necessary. And here, Congress has not

2

even tried to show, much less established, that Georgia and other States are pervasively violating the Fifteenth Amendment's ban on intentional racial discrimination. To the extent § 2 requires Georgia to racially redesign its electoral maps on the basis of nothing more than ordinary partisan outcomes, it oversteps Congress's authority.

Of course, the Court need not reach that point. Interpreting § 2 correctly should be enough. But one way or the other, the Court should reverse the district court.

## ARGUMENT

## I.    Plaintiffs failed to prove a § 2 violation.

Section 2 is triggered when a minority group loses elections because of race, not when Democrats lose elections because voters prefer Republicans. It requires *racial* bloc voting, not partisan bloc voting. And even if Plaintiffs could overcome the lack of race-based voting patterns, their claims fail anyway because the totality of the circumstances shows that there is no vote dilution here. The district court's contrary conclusion was riddled with legal and factual errors, and Plaintiffs do nothing to show otherwise.

3

**A.    Plaintiffs did not prove that they have lesser opportunity "on account of race."**

**1.    To prove vote dilution "on account of race," Plaintiffs must prove racial, not partisan, bloc voting.**

The district court held that it need not disentangle race and party when determining whether there is racially polarized voting.  Doc. 268 at 40; Doc. 333 at 201.[1]  That is not what the statute says, it is not what the cases the statute was intended to codify say, and it is not what the cases interpreting the statute say.  Plaintiffs' counterarguments are unconvincing.

**a.**  Plaintiffs virtually ignore the "plain language" of § 2. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1330 (11th Cir. 2021).  A plaintiff must show that a challenged map dilutes a minority group's voting power "on account of race."  52 U.S.C. § 10301(a).  And the term "on account of" imposes "a causation requirement."  *Greater Birmingham Ministries*, 992 F.3d at 1330 (quotation omitted).  The text, moreover, does not guarantee that minority-preferred candidates will win elections.  *League of Utd. Latin Am. Citizens v. Perry*, 548 U.S. 399, 428 (2006) (*LULAC*).  As long as a minority group has

---

[1] All record citations refer to the docket in *Alpha Phi Alpha Fraternity, Inc. et al. v. Raffensperger*, No. 1:21-cv-05337.

the same "*opportunity* [as] other members of the electorate to participate in the political process," there is no § 2 violation, even if the minority group's preferred candidates happen to lose.  52 U.S.C. § 10301(b) (emphasis added).  Racial minorities, in other words, have the same "obligation to pull, haul, and trade to find common political ground" as all other voters.  *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994).  So if black voters fail to elect candidates because they are Democrats—if partisanship, not race, explains voting patterns—there is no § 2 problem.  Opening.Br.21-27.

Plaintiffs put forth two basic tactics to read "on account of race" out of the statute.  52 U.S.C. § 10301(a).  First, they try to collapse race and partisanship together, insisting that, because black voters generally support Democrats, partisan preferences are *necessarily* racial preference.  *See, e.g.*, Grant/Pendergrass.Br.27-28 (arguing that "parties are simply the organizing vehicles" for racial interests).

That cynical argument fails.  Correlation is not causation: the mere fact that black Georgians prefer Democrats who lose elections does not mean those Democrats lose elections *because* they are supported by black Georgians.  *See Thornburg v. Gingles*, 478 U.S. 30, 100 (1986) (O'Connor, J., concurring) (§ 2 should not

apply in cases where the partisan preferences of racial groups
merely "diverge").  If Plaintiffs were correct, then § 2 would be
triggered whenever Republicans win elections, simply because
black voters prefer Democrats, and that (unconstitutional) view
cannot be correct.  The Supreme Court rejected a nearly identical
argument just weeks ago in the context of racial gerrymandering
claims.  *Alexander v. S.C. State Conf. NAACP*, 144 S. Ct. 1221
(2024).  Race and partisanship, the Court emphasized, are not the
same thing.  *Id.* at 1233 (parties "must disentangle race and
politics").  And plaintiffs cannot "sidestep" this distinction merely
by noting that "race and partisan preference are very closely
correlated."  *Id.* at 1241-42.  If they could, then every plaintiff
would "simply reverse-engineer … partisan data into racial data
and argue that the State impermissibly" sorted voters based on
race.  *Id.* at 1242.  So too here: if § 2 plaintiffs were allowed to
"exploi[t] the tight link between race and political preference,"
then they would simply "repackage" evidence of partisan
polarization to argue that voting is *racially* polarized.  *Id.*  But
§ 2's racial causation requirement "cannot be evaded with such
ease."  *Id.*

Plaintiffs and DOJ next accuse the Secretary of conflating
causation (which § 2 requires) and intent (which it does not).  *See*

6

APA.Br.3, 12; Grant/Pendergrass.Br.10, 26, 33; DOJ.Br.18-19. But as the Secretary already explained, "intent and causation are entirely distinct concepts."  Opening.Br.28.  Causation asks what circumstance precipitated the plaintiff's alleged injury, while intent asks whether the defendant acted with a particular purpose in mind.  Opening.Br.28 (citing Restatement (Second) of Torts §§ 8A, 9 (1965); Model Penal Code §§ 2.02(2), 2.03(1)).  One can intend to cause something and not actually cause it, or cause something without necessarily intending it.

No one needs to prove "animus" toward black voters, *contra* DOJ.Br.7, but Plaintiffs do need to prove that race is the *cause* behind their (supposed) lack of equal opportunity.  If black, Latino, Asian-American, Native American, and white Democrats are all in the same boat—Democrats tend to lose—then there is no racial causation.  Plaintiffs have to prove there is something different about their struggles to elect preferred candidates than the struggles of every other voter who prefers Democrats.  Plaintiffs need not prove "why" voters vote the way they do, but Plaintiffs do need to prove that voting patterns are injuring them on the basis of *race*, rather than ordinary partisan politics.

**b.** Case law confirms that § 2 requires racial causation, Opening.Br.22-25, 27, and Plaintiffs misread most of it.

7

Conspicuously—and tellingly—Plaintiffs almost entirely ignore *Whitcomb v. Chavis*, 403 U.S. 124 (1971), the very case that Congress "intended to codify" when it adopted the results test for § 2 claims in 1982. *Gingles*, 478 U.S. at 83 (O'Connor, J., concurring). *Whitcomb* forecloses Plaintiffs' case: as the Court explained there, plaintiffs cannot establish vote dilution simply by showing that black voters "predominantly [vote] Democratic" and Democrats "suffe[r] the disaster of losing too many elections." 403 U.S. at 153. After all, in that scenario, "whites who also voted Democratic and lost" are equally disadvantaged. *Id.* at 154. And if the Democrats were to win, then *no one*, black or white, would have any "justifiable complaints about representation." *Id.* at 152. If Plaintiffs were correct that § 2 is triggered whenever different racial groups tend to vote for different parties, then *Whitcomb* would have come out the other way.

The Secretary emphasized *Whitcomb* in his opening brief, but the only mention from Plaintiffs or DOJ is a passing footnote in the APA Plaintiffs' brief. APA.Br.21 n.2. They note that, in *Whitcomb*, both parties supported black candidates at different times. *Id.* But that does nothing to distinguish *Whitcomb*, which did not rely on that point. The decision turned on the fact that plaintiffs' losses at the polls were not the result of "built-in bias

8

against poor [blacks]," even though black voters' preferred candidates were losing. 403 U.S. at 153. Anyway, the facts here are just the same: majority support for candidates of either party does not change based on the race of the candidate. *See* Doc. 253-5 at 4 (Secretary's expert report noting that voter preferences are "clearly not [due to] Black voter[s'] preferences for Black candidates or white voter[s'] disinclination to vote for Black candidates."). Indeed, both parties have nominated black candidates in recent statewide elections, and black and black-preferred candidates have enjoyed immense success. Opening.Br.32-33.

While they ignore *Whitcomb*, Plaintiffs misread *Gingles*. As the Secretary explained, Opening.Br.22, only Justice Brennan's plurality opinion embraced the view, put forth by Plaintiffs here, that a mere difference in partisan preference between minority and majority racial groups was sufficient to establish racial bloc voting. 478 U.S. at 61-74. Justice White wrote separately to specifically reject that view: it revealed only "interest-group politics," not racial discrimination. *Id.* at 83. And Justice O'Connor, writing for herself and three others, "agree[d] with Justice White." *Id.* at 101. She wanted to keep the focus on cases of "intensive racial politics" rather than cases where the partisan

preferences of racial groups simply "diverge." *Id.* at 100-01 (quotation omitted).

Plaintiffs and DOJ make a few arguments about *Gingles*. First, they argue that Justice O'Connor actually agreed with Justice Brennan, not Justice White. *See* APA.Br.17-18; Grant/Pendergrass.Br.30-31; DOJ.Br.11-12. But that is wrong because, in addition to *saying* that she agreed with Justice White, 478 U.S. at 101, Justice O'Connor rejected the entire framework that Justice Brennan's opinion established for evaluating vote dilution claims—that's why she did not join his opinion. In her view, the majority's "test for vote dilution" would effectively "creat[e] a right to a form of proportional representation" because it would find a violation whenever a minority group lost elections. *Id.* at 85, 91.

Justice O'Connor accepted the idea that one need not examine causation to determine *whether* minority-preferred candidates are losing elections (an undisputed proposition if there ever was one), but she did not accept the idea that racial causation was somehow irrelevant to the "overall vote dilution inquiry." *Id.* at 100. Plaintiffs and DOJ take this to mean that causation is just something to throw into the totality of the circumstances test, Grant/Pendergrass.Br.31, DOJ.Br.11, but that is wrong and

ultimately irrelevant.  To start, Justice O'Connor wanted the
entire inquiry to be a totality analysis, and she lost on that point.
Moreover, even if racial causation of voting patterns is a point to
be examined in the totality, so what?  Plaintiffs must still prove it
or there is no racial causation.

Next, Plaintiffs and DOJ argue that Justice White (and
maybe Justice O'Connor) disagreed only with Justice Brennan's
assertion that racial causation is *never* relevant in the vote
dilution inquiry.  Grant/Pendergrass.Br.31; DOJ.Br.11-12.  But
Justices White and O'Connor clearly agreed that when the
evidence shows that a "candidate preferred by the minority group
… was rejected by white voters for [non-racial reasons]," it will
normally preclude a finding of vote dilution because it suggests
"that another candidate, equally preferred by the minority group,
might be able to attract greater white support in future elections."
478 U.S. at 100 (O'Connor, J., concurring); *see also id.* at 83
(White, J., concurring).  Finding liability where there is no racial
causation would be "quite at odds" with *Whitcomb* and "give no
effect whatever" to Congress's "repeated emphasis" on the
necessary "domina[nce]" of "racial politics."  *Id.* at 83 (White, J.,
concurring), 101 (O'Connor, J., concurring).  To put a finer point
on it: Justice O'Connor "flatly rejected the proposition that 'any

11

group with distinctive interests must be represented in legislative halls.'" *Id.* at 98 (O'Connor, J., concurring) (quoting *Whitcomb*, 403 U.S. at 156). But that is just another way of saying that § 2 applies only where a group's lack of political access is caused by racial, rather than *partisan*, voting patterns.

Causation just wasn't a relevant question in *Gingles* itself because no one denied that the voting patterns were caused by race. *See id.* at 59 (observing, in stark contrast to this case, that a majority of white voters of both parties consistently voted against black candidates). The *most* that can be said for Plaintiffs' arguments on *Gingles* is that the opinions did not agree on the question of racial polarization, but they all agreed it did not matter in that case. So while this Court should read the concurrences in *Gingles* as support for the correct view of § 2, even if it does not go that far, *Gingles* plainly did not resolve this question *against* the Secretary's position.

Perhaps sensing as much, Plaintiffs rely heavily on a single line from *Allen v. Milligan*, in which the Supreme Court reiterated *Gingles*'s uncontroversial conclusion that the statutory term "on account of race" means "with respect to race" and does not require discriminatory purpose. 599 U.S. 1, 25 (2023); *see, e.g.*, APA.Br.12, 17; Grant/Pendergrass.Br.31-32; DOJ.Br.10. No

dispute there: a § 2 vote dilution claim does not require proof that the State was *trying* to suppress minority votes.  But that is a far cry from suggesting that § 2 has no racial causation requirement.  The *Milligan* Court said nothing of the sort, because causation was not contested in that case.  The district court found that voting patterns were race-based, not partisan-based, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1018-19 (N.D. Ala. 2022), and Alabama did not argue otherwise to the Supreme Court, Br. for Petitioner, *Allen v. Milligan*, 599 U.S. 1 (2023) (No. 21-1086).

Finally, Plaintiffs try and fail to distinguish the out-of-circuit cases embracing the Secretary's view.  To start, the Fifth Circuit's decision in *League of United Latin American Citizens v. Clements* is directly on point.  999 F.2d 831 (5th Cir. 1993); *see also* Opening.Br.27.  Plaintiffs and DOJ barely even try to assert otherwise.  The Second Circuit in *Goosby v. Town Board of Hempstead* favorably cited *Clements* (it just so happened that there *was* significant evidence of racial causation in *Goosby*).  180 F.3d 476, 496 (2d Cir. 1999).  The First Circuit made the same basic points in *Uno v. City of Holyoke*, 72 F.3d 973 (1st Cir. 1995).  Plaintiffs point to the First Circuit's statement that causation evidence should be considered at the totality stage, *see* APA.Br.22; Grant/Pendergrass.Br.36, but that ignores the decision's core

13

holding. Whether considered at the totality stage or the preconditions stage, evidence that race "is not the cause of [the minority's] electoral defeat" is fatal for a vote dilution claim. 72 F.3d at 981. Other circuits have said much the same. *See, e.g.*, *Baird v. Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (denying relief where voters simply "seem to prefer Republicans" because § 2 "is a balm for racial minorities, not political ones"). And members of this Court have as well. *See Nipper v. Smith*, 39 F.3d 1494, 1512 (11th Cir. 1994) (en banc) (favorably citing *Clements*). The circuits might disagree on *where* in the analysis to examine racial causation, but not on its necessity.

To the extent it matters, it makes more sense to place the inquiry in the prerequisites phase. In *United States v. Marengo County Commission*, this Court explained that the "surest indication of race-conscious politics is a pattern of racially polarized voting," 731 F.2d 1546, 1567 (11th Cir. 1984), a point that has likely informed this Court's statements that satisfying the *Gingles* prerequisites ordinarily leads to liability, *see Wright v. Sumter Cnty. Bd. Elections & Registration*, 979 F.3d 1282, 1304 (11th Cir. 2020). That is plainly true with respect to *genuine* racial polarization—the kind at issue in *Gingles* and *Marengo*. But if it is just partisan disagreement, there is no reason to

14

presume *anything* about whether a minority lacks equal opportunity "on account of race."

*    *    *

Ultimately, Plaintiffs lean into the very problems the Secretary already identified.  Opening.Br.25-26.  They think it is a *feature* of § 2 that it puts a thumb on the scale in favor of Democrats.  APA.Br.22-23; Grant/Pendergrass.Br.27-30.  Likewise, Plaintiffs' briefs are odes to proportionality.  They repeatedly emphasize that Georgia's black population has grown while the number of majority-black districts has not kept pace.  APA.Br.4-5, 51; Grant/Pendergrass.Br.12-13, 41-42, 49-50.  That is normal—one would not think that minority-majority *districts* should necessarily grow at the same rate as the minority unless the State were racially gerrymandering to make it so.  That is just proportionality in action, and it illuminates the basic flaws in Plaintiffs' understanding.  Plaintiffs must prove racial causation.  And if voters are voting along ordinary partisan lines, Plaintiffs have proved nothing of the sort.

### 2. The evidence here shows ordinary partisanship, not racial bloc voting.

As the Secretary already explained, the evidence shows that voting patterns in Georgia follow colorblind partisan politics, not

15

race.  Opening.Br.29-34.  The clearest indication of this is that votes do not change based on candidates' race.  *Cf. Gingles*, 478 U.S. at 83 (White, J., concurring).  Plaintiffs, for their part, disclaimed any attempt to disentangle race and partisanship—as did the district court—and what evidence they do offer proves little.  They say (1) race *determines* party preferences and so (2) any partisan polarization is *effectively* racial polarization. APA.Br.25-28, Grant/Pendergrass.Br.37-38.  That is, because race is the "best predictor" of partisan preference, APA.Br.26-27, they have proven racial causation.

But to say that race can (sometimes) *predict* partisan preference is a far cry from saying race *causes* the voting patterns at issue.  Again, correlation does not equal causation, and the basic (unrefuted) point that the majority does not change its voting patterns based on the race of the candidate critically undermines the notion that it is the *race* of voters and candidates that determines elections.  Indeed, the very evidence on which the district court relied for this argument—data from Plaintiffs' expert showing that black candidate success goes down as the percentage of white voters increases—also shows that *white* Democrats are more likely to lose in districts with more white voters.  Doc. 333 at 239.  Plus, the district court specifically found

16

"[in]sufficient evidence to show that Black people myopically vote for the Democratic candidate." *Id.* at 240.

Plaintiffs try to imbue the partisan divide with racial significance, asserting based on vague expert opinions that black voters in particular choose to support the Democratic Party because they believe it has "fewer problems related to racial issues." APA.Br.28; *see also* Grant/Pendergrass.Br.27-28. But even assuming that conclusory assertion is true, it just proves the Secretary's point: black voters in Georgia select candidates based on perceptions of partisan policy positions.

Regardless, Plaintiffs misunderstand the causation inquiry: even if black voters *are* voting based on race, the question is whether the "*majority*" is voting "as a bloc … to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51 (emphasis added). And there is no evidence of that: the majority votes on partisan lines without any change in support based on race. Opening.Br.29-34.

Plaintiffs briefly suggest that identical majority support for candidates across different elections is not very meaningful—only individual elections with candidates of different race should matter. APA.Br.29-30. That is hardly true—both are highly probative—but regardless, the evidence *does* show that non-black

17

voters are willing to vote for black candidates over white candidates, as long as they are not Democrats. The primary and non-partisan election evidence shows as much. Opening.Br.6-7, 30, 41. Just as one example, in the 2022 Republican primary for U.S. Senate, Herschel Walker—who is black—received more than 67% of the vote in a field that included three white candidates. Doc. 253-5 at 10; *see also id.* at 9 (noting that most Republican primary voters are white).

Plaintiffs' one foray into this area shows how little evidence of racial polarization there is—and how willing Plaintiffs are to manipulate statistics to create racial tension out of thin air. Plaintiffs point to their expert Dr. Handley, who examined eleven Democratic primaries that involved black candidates. Doc. 357-12 at 11. She determined that the "majority" (55%) were racially polarized. *Id.* But you would *expect* racial polarization in roughly half of the elections if race were not the determinative factor. That is because Dr. Handley defined "racial polarization" to mean that a bare majority of one race votes differently than a bare majority of the other. Doc. 386 at 7; Doc. 332 at 30. And the odds of *any* election being "racially polarized" are then 50%, if we assume that a majority of black and white voters are equally likely to agree or disagree. So if roughly half of elections fall

within Plaintiffs' definition of "racially polarized," that is a normal result of colorblind politics. *See generally* Doc. 229 at 213-17. Plaintiffs' "misleading" use of statistics would hide the basic truth that there is little evidence of genuine racial polarization and significant evidence against it. *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 680 (2021).

In any event, Plaintiffs do not dispute that black voters can and do nominate their preferred candidates in primaries and that, once they do, white Democrats vote overwhelmingly in their favor. Opening.Br.30-31. That is not intensive racial politics. That is ordinary partisan politics, and it cannot support a claim for vote dilution.

## B. Plaintiffs repeat the district court's errors in evaluating the totality of the circumstances.

Even if Plaintiffs could satisfy *Gingles* without proving genuine racial bloc voting, they did not prove, "based on the totality of circumstances," that black voters in Georgia have "less opportunity" than other racial groups. 52 U.S.C. § 10301(b). The district court's contrary conclusion was riddled with legal and factual errors, Opening.Br.35-43, and Plaintiffs repeat those errors.

Factors 1 & 3.  Properly understood, Factor 1, which asks whether a State engages in official discrimination, requires evidence of "pervasive *purposeful* discrimination."  *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984) (emphasis added).  Plaintiffs insist that Factor 1 "encompasses all state actions that have a discriminatory effect," Grant/Pendergrass.Br.39-40, by which they just mean disparate impact, but they have no support for that contention.  Bizarrely, they cite *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, where the Court laid out factors to examine when looking for *intentional* discrimination.  429 U.S. 252, 266-68 (1977).  Disparate impact is not official discrimination.  And here, the district court could not point to any official electoral discrimination in Georgia in the last four decades.

Plaintiffs—like the district court—fault Georgia for its voter ID laws and its decision to update voter registration lists.  APA.Br.33-34; Grant/Pendergrass.Br.17-18, 40.  But those policies are plainly legal, as *the district court itself held.*  Doc. 333 at 224, 443.  Plaintiffs have no plausible justification for how plainly legal voter rules can be evidence of "official discrimination."  *See also* Opening.Br.36-37.  If those laws were discriminatory, this very district court could not have upheld them.

20

Plaintiffs repeat but don't defend the notion that Georgia is to be held liable under § 2 for *opposing* the reauthorization of § 5. APA.Br.31-32.[2]  They do not defend the district court's faulting Georgia for supposedly racially gerrymandering in the 1990s— when it did so begrudgingly, at the demand of DOJ, which wrongly argued the VRA required it.  Alabama.Amici.Br.25-26. Plaintiffs point to a single county with an at-large election system that failed under § 2 in 2015, APA.Br.32, but no one established that county intentionally discriminated against anyone.

Plaintiffs do not point to *any* meaningful evidence of unconstitutional discrimination by Georgia in the last 40 years. And of course, the district court in this case explicitly found that the challenged maps were the result of partisan politics, not intentional racial discrimination.  Doc. 333 at 260-62, 475-77, 489-91.

Plaintiffs likewise cannot explain how Factor 3, which asks whether the State uses electoral devices that enhance the opportunity for discrimination, tilts their way.  In fact, Georgia's

---

[2] Notably, Justice Kavanaugh emphasized the importance of statutory stare decisis in *Milligan*, because Congress could always adjust the Voting Rights Act.  599 U.S. at 42 (Kavanaugh, J., concurring).  But Plaintiffs and the district court would hold Georgia liable for urging Congress to do just that.

electoral policies regularly produce victories for black candidates. *See, e.g.*, Doc. 270-5 at 55.

<u>Factor 2.</u>  Even if evidence of genuine racial polarization is not required to satisfy the *Gingles* preconditions, the lack of it critically undermines Plaintiffs' case.  Voting in Georgia is polarized along partisan, not racial, lines.  *See supra* Part II.B.  Plaintiffs hardly even disagree with that reality, just trying (again) to offload their burden of *proving* racial causation onto the Secretary.  *See, e.g.*, APA.Br.34.

<u>Factor 5.</u>  Plaintiffs repeat the district court's error of comparing black voter turnout to white voter turnout, when the concern should be turnout gaps between the minority (in this case black Georgians) and the majority (everyone else).  *See LULAC*, 548 U.S. at 444; 52 U.S.C. § 10301(b) (comparing the minority to "other members of the electorate").  Plaintiffs have no authority for the notion that the minority should be compared to *white* voters instead of the *majority*.  And their position would lead to absurd results.  Suppose a district has 20% black voters, 30% Latino voters, and 50% white voters, and the Latino voters always vote against black-preferred candidates, but white voters vote roughly evenly.  The black-preferred candidate will always lose.  Yet apparently, in Plaintiffs' view, this does not even implicate § 2

because the *white* voters are not polarized.  That makes no sense: the question is minority versus majority, not minority versus plurality or minority versus white.

Applying the right legal standard in this case makes a material difference.  Between black and white voters, the district court found a 12.6-point turnout gap in the 2020 election.  Doc. 333 at 244.  But that gap is nearly cut in half with the right comparator: the difference in turnout between black and non-black voters was only 7.9 points.  *See* Ga. Sec'y of State*, Data Hub – November 8, 2022 General Election*, https://bit.ly/3wbMPoi.

And the data on voter registration is a serious problem for Plaintiffs.  There is nearly no disparity at all on that front: 98% of *all* eligible voters in Georgia are registered to vote.  Doc. 332 at 103.  Unsurprisingly, Plaintiffs do not mention this point.

Factor 6.  On this factor, too, Plaintiffs hardly put up a fight. The district court described a number of ordinary campaign promises as "racial appeals" based only on the court's apparent disagreement with the candidates' policy positions. Opening.Br.40.  The court, for example, faulted Governor Brian Kemp for vigorously opposing *illegal* immigration.  Opening.Br.40; Doc. 333 at 251 n.63, 466 n.112.  But promises to enforce the law

are not racial appeals.  *Brnovich*, 594 U.S. at 689 ("[P]artisan motives are not the same as racial motives.").

Factor 7.  Finally, Plaintiffs try to defend the district court's conclusion that black Georgians are underrepresented in statewide political office.  But the evidence is overwhelmingly against them.  Black Georgians account for 31.7% of the State's voting-age population.  Doc. 333 at 265.  Yet they make up 35.7% of the State's congressional delegation and half of its Senate delegation—*outperforming* proportionality.  *Id.* at 266, 491.  They also constitute 25% of the Georgia Senate and almost 23% of the Georgia House, and they routinely win state office.  *Id.* at 255; Opening.Br.6-7.

Plaintiffs hardly address these numbers at all.[3]  They assert that black voters are not proportionally represented because they do not have a proportional number of majority-black districts, Grant/Pendergrass.Br.41, but that is an extraordinary claim.

---

[3] Many of Plaintiffs' responses are nonsensical or self-defeating.  For instance, they bemoan that "64.29%" of Georgia's congressional districts are majority-white, Grant/Pendergrass.Br.49, but of course that is true.  The majority is in the majority in the majority of districts.  Regardless, it is *Plaintiffs* who want the State to pack black voters into majority-black districts, thus ensuring that the remaining districts will remain majority-white.

24

Georgia is to be faulted because black Georgians are overly represented in Congress but there is not a proportional number of majority-black *districts*?  If that is the sort of "problem" § 2 is meant to "solve," it only reaffirms how blatantly unconstitutional it would be.  *See infra* Part II.

The anecdotes Plaintiffs rely on (e.g., that Georgia had not elected a black Senator before Raphael Warnock) are hardly representative of black success in Georgia politics generally or black candidate success today.  *See* APA.Br.35-36.  Plaintiffs want to fight a battle against the Georgia of 1960.  But the Georgia of 2024 is wildly different, and the district court clearly erred in downplaying the across-the-board success of black candidates in Georgia.  That is the "most important" factor at the totality stage, *Gingles*, 478 U.S. at 48 n.15, and these numbers should make anyone wonder how a court could hold that Georgia's maps result in unequal opportunity for black voters.

## II.  The district court's race-based remedy is not justified by present-day circumstances.

As the Secretary previously explained, to the extent § 2 is interpreted to provide for racial gerrymandering as a remedy in the circumstances of this case, it would be unconstitutional.  Congress's power to require electoral racial segregation as a

25

remedy for purported vote dilution "cannot extend indefinitely into the future." *Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring). Congress has not even attempted to justify the need for this type of prophylactic legislation where there is no inkling of intentional discrimination. Opening.Br.49-51.

Much of Plaintiffs' response on this score attacks a straw man. The Secretary does not assert that § 2 is or was unconstitutional in every case. *Contra, e.g.*, APA.Br.46-47 (describing the Secretary's challenge as "facial"). Rather, § 2 as interpreted by the district court *here* is unconstitutional *today*, and none of Plaintiffs' or DOJ's arguments to the contrary is persuasive.[4]

---

[4] Plaintiffs and DOJ assert that the Secretary forfeited this argument. APA.Br.45-46; DOJ.Br.22-25. But the Secretary plainly argued that "inherently race-based remedies are not justified by present conditions and are not [a] congruent and proportional" exercise of Congress's enforcement powers. Doc. 280 at 23; *see also* Doc. 263 at 20-21; Doc. 325 at 37, 39-40. And the Secretary made clear that the court should not interpret § 2 as Plaintiffs requested because to do so would make it unconstitutional. Doc. 390 at 84-86. The Secretary did not level a facial challenge against § 2 *correctly* interpreted—but the Secretary does not do so now, either.

### A.   Prophylactic legislation must reflect current conditions.

The Fifteenth Amendment prohibits only intentional discrimination, and § 2 goes beyond that.  So it is "prophylactic legislation," which is appropriate only if it is a congruent and proportional response to the problem it seeks to address; it may not be used to redefine the States' constitutional obligations.  *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 727-28 (2003). Accordingly, Congress must find a pattern of unconstitutional conduct by the States and then craft a "limited response" to address that pattern.  *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 771, 773 (11th Cir. 2020).  Critically, a law that "imposes current burdens … must be justified by current needs," *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009)—especially a law that imposes the extraordinary burden of racial gerrymandering, *cf. Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022) (sorting voters based on race is "odious" (quotation omitted)).

Plaintiffs and DOJ argue that the congruence-and-proportionality test articulated in *City of Boerne v. Flores*, 521 U.S. 507 (1997), which considered the Fourteenth Amendment, does not apply to the Fifteenth Amendment.  APA.Br.47-48; Grant/Pendergrass.Br.42-43; DOJ.Br.26-28.  In Plaintiffs' view,

27

the Fifteenth Amendment is different from the Fourteenth because the "substantive scope of the rights at issue is already well-defined and limited." APA.Br.48.

Plaintiffs are wrong. The Supreme Court has consistently held that Congress's enforcement powers under the Fourteenth and Fifteenth Amendments are coextensive and equally confined. *See, e.g.*, *City of Boerne*, 521 U.S. at 518 (describing Congress's "parallel power to enforce the provisions of the Fifteenth Amendment"); *Bd. of Trs. Of Univ. of Ala. v. Garrett*, 531 U.S. 356, 373 n.8 (2001) ("Section 2 of the Fifteenth Amendment is virtually identical to § 5 of the Fourteenth Amendment."). And that makes sense as a matter of first principles. *Contra* DOJ.Br.27. Like the Fourteenth Amendment, the Fifteenth Amendment fundamentally alters the balance of state and federal power in a critically important area. "Redistricting" is traditionally a "domain of state legislative authority." *Alexander*, 144 S. Ct. at 1233. "[F]ederal-court review of districting legislation represents a serious intrusion on" that domain. *Id.* (quotation omitted). The Fifteenth Amendment's narrower scope is reason to analyze Congress's attempts to use its authority *more* carefully, not less.

Here, for instance, the district court interpreted § 2 to require Georgia to racially gerrymander additional majority-black

districts on the basis of a potpourri of unrelated factual points including Georgia's distant history, its use of perfectly legal voter-ID laws, and its apparent opposition to reauthorizing part of the Voting Rights Act two decades ago.  Surely Congress must justify the need for such an extreme measure if it is going to rely on its authority to enforce a prohibition against *intentional* discrimination.

Remarkably, DOJ's argument to the contrary relies heavily on Justice Scalia's dissent in *Tennessee v. Lane*, 541 U.S. 509 (2004).  DOJ.Br.27-28.  But DOJ misses—or misrepresents—the point of his opinion.  Justice Scalia thought that the congruence-and-proportionality test was *already* too broad—for both the Fourteenth *and* the Fifteenth Amendments.  *Lane*, 541 U.S. at 557-58 (Scalia, J., dissenting).  As he saw it, the power to "enforce" the Amendments means nothing more than the power to statutorily proscribe what already falls within the plain language of the Amendment's substantive provisions.  *Id.* at 558-59.

Plaintiffs and DOJ also try (and fail) to diminish the relevance of *Shelby County v. Holder*, 570 U.S. 529 (2013).  DOJ.Br.31-34; APA.Br.45-46.  They say § 2 is less intrusive than the preclearance requirement considered in *Shelby County* because the preclearance requirement applied to laws that the

States "would otherwise have the right to enact and execute." DOJ.Br.31 (quotation omitted). So, their logic goes, *Shelby County*'s requirement that prophylactic legislation reflect "current conditions" should not apply to § 2. DOJ.Br.33 (quoting 570 U.S. at 553). But the same is true here: whenever § 2 is applied to a state legislative act, it invalidates legislation that the State would otherwise have the right to "enact and execute."

Plaintiffs also argue that § 2, unlike § 5, is not "extraordinary, drastic, unprecedented." Grant/Pendergrass.Br.46. Yet as Plaintiffs would interpret it, § 2 requires States to affirmatively racially segregate voting districts not as a remedy for *undoing* racial discrimination, but as a remedy for the perfectly ordinary reality that sometimes minorities prefer a party that is in the minority. That is an *extraordinary* imposition on state sovereignty, not to mention an anti-democratic thumb on the scale for a particular party.

DOJ acknowledges that the "core injury targeted" by § 2 is intentional discrimination, yet nevertheless argues that § 2 is valid because it is "preventive." DOJ.Br.30 (quotation omitted). Under the Secretary's view of the statute, that is correct—but under DOJ's view, it is nowhere close. In DOJ's understanding, if minority voters prefer tighter trade controls, and majority voters

30

prefer greater free trade, and so the majority usually votes against the minority-preferred candidates, there should be § 2 liability. That is not a preventative measure, that is a permanent racial preference, and Congress must at least *justify* the supposed ongoing need for that preference if it is going to rely on its Fifteenth Amendment authority.

Contrary to Plaintiffs' protestations, APA.Br.53-54; Grant/Pendergrass.Br.46-47, race-based remedies put this issue firmly in the territory of *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, where the Court affirmed that racial classifications must at some point "end." 600 U.S. 181, 212 (2023). Classifying Americans based on race in elections is no less "odious" to the Constitution than accepting or denying university applicants based on race. *Wis. Legislature*, 595 U.S. at 401. The Reconstruction Amendments were "designed to eradicate race-based state action" in all regards, not just education. *Alexander*, 144 S. Ct. at 1236 (citing *SFFA*, 600 U.S. at 206). DOJ bemoans that it would "burden" Congress to have to update laws that explicitly require racial sorting. DOJ.Br.34-36. But it is a *feature* of our constitutional system that racial classifications must be impermanent.

31

Plaintiffs next argue that § 2 will naturally end, because when racial polarization ends, § 2 will enter "desuetude," Grant/Pendergrass.Br.45-46; *see also* APA.Br.50-51; DOJ.Br.33-34, but that misses the point. As correctly understood, § 2 *should* enter something close to desuetude, and we would be there right now. A § 2 that reaches only jurisdictions where "racial politics dominate the electoral process," *Gingles*, 478 U.S. at 101 (O'Connor, J., concurring), is much less of a constitutional concern, because it is tightly connected to concerns of intentional discrimination. If § 2 applies only in those jurisdictions where black voters inexplicably fail to elect candidates of choice, without any reasonable alternative explanation other than race, § 2 has already largely succeeded in its goals and will rarely apply. But Plaintiffs want something else: a § 2 that applies whenever black voters prefer a political party that tends to lose. *That* § 2 has no end date—as long as minority voters vote cohesively for a particular party, § 2 will forever demand racial gerrymandering to provide a partisan boost to that preferred party.

Plaintiffs and DOJ also try to wring out of *Allen v. Milligan* the notion that § 2 must be constitutional, APA.Br.46; Grant/Pendergrass.Br.43-44; DOJ.Br.21-22, but that argument has two problems. First, Justice Kavanaugh—the critical fifth

32

vote in *Milligan*—explicitly *declined* to address the argument that
§ 2 fails congruence-and-proportionality review 40 years after the
last substantive amendment. 599 U.S. at 45. Second, the
Secretary does not believe § 2 is unconstitutional. The point is
that it *would be* if the district court and Plaintiffs' interpretation
were correct.

Lastly, Plaintiffs argue that § 2 has not "substantively
redefine[d]" the State's obligations because all a State has to do is
"refrain from drawing maps that are discriminatory in effect."
APA.Br.50 n.14. Set aside that Plaintiffs' version of § 2 goes well
beyond the Fifteenth Amendment, so it must redefine state
obligations. Set aside that no state legislature can ever know
whether it will be held liable under Plaintiffs' view of § 2, since
liability can be based on laws that were adjudicated valid but
somehow evince "discrimination." Set aside that it is almost
always practically impossible to comply with Plaintiffs' view of § 2
without racially gerrymandering. Even if none of that were true,
Plaintiffs' theory requires States to privilege Democrats because
black voters vote cohesively for them. The Fifteenth Amendment
requires no such thing, and if Congress is going to maintain § 2 in
that form, it has to justify the need for these race-based remedies.

33

### B. Plaintiffs' version of § 2 is not a congruent and proportional response to intentional discrimination.

In the past 40 years, Congress has not even arguably attempted to justify the need for an across-the-board racial "remedy" for situations where Democrats lose elections—so § 2, as applied by the district court here, is unconstitutional. Opening.Br.49-51. Plaintiffs also do not attempt to provide evidence that the district court's supercharged version of § 2 would be a congruent and proportional response to purported Fifteenth Amendment violations, and for good reason. One, they can't do Congress's job for it. Opening.Br.51. Two, there is no such evidence. States—and in particular Georgia—do not regularly engage in intentional discrimination, and the few times courts find otherwise are almost always when a State attempts to *comply with* § 2 (or, previously, § 5). *See, e.g.*, *Abbott v. Perez*, 585 U.S. 579, 620-22 (2018).

Plaintiffs give away the game when they acknowledge that the Supreme Court has approved "race-based government action" only to "remediate specific, identified instances of past discrimination." Grant/Pendergrass.Br.46. There is no specific instance of discrimination identified here, nor a pattern of intentional discrimination that could justify such extreme relief.

If Congress is going to demand racial remedies for perfectly constitutional conduct, it must justify the necessity of that demand with reasonably contemporary evidence, and Congress has not even tried to do so here. If the district court was right on the statute, it was wrong on the Constitution, and this Court should reverse.

## III. Section 2 cannot be enforced through private action.

Section 2 does not provide a private right of action, and Plaintiffs' arguments to the contrary fall flat. This Court should follow the only well-reasoned decision on this topic. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

### A. The Act's text and structure show that Congress did not create a private cause of action.

Only Congress can create a private right of action. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). And if Congress wants to create a cause of action, it must do so in clear terms. *See In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc). If there is even a "single sound reason" to think Congress did not intend a private cause of action, the courts must "refrain from creating" one. *Egbert v. Boule*, 596 U.S. 482, 491 (2022). Because the text

of § 2 contains no private right of action, there isn't one.
Opening.Br.58-61.

Plaintiffs and DOJ make a futile attempt to locate a cause of
action in *other* sections of the Act.  APA.Br.41-44;
Grant/Pendergrass.Br.55-57; DOJ.Br.44-47.  As the Secretary
noted in his opening brief, § 3's reference to suits by "an aggrieved
person" merely recognizes private causes of action that *already*
existed when that term was added to the statute in 1975—like
suits under § 1983 alleging violations of the Fifteenth
Amendment.  Opening.Br.62-63.

Other language in § 3 confirms that conclusion.  It refers to
suits by "the Attorney General *or* an aggrieved person," 52 U.S.C.
§ 10302 (emphasis added), and "no one would have thought that
§ 3 created a cause of action" for the Attorney General because
§ 12 already does that, *Ark. State Conf. NAACP*, 86 F.4th at 1211.
So it would be odd to read the statute's parallel reference to
"aggrieved person[s]" as creating a cause of action.  Furthermore,
§ 3 recognizes suits by "an aggrieved person … *under any statute*
to enforce the voting guarantees of the fourteenth or fifteenth
amendment[s]."  52 U.S.C. § 10302 (emphasis added).  Plaintiffs
say this language somehow creates a cause of action for *every*
voting-related statute, *see, e.g.*, APA.Br.43, but that argument

flips the statutory language on its head.  The term "under any statute" doesn't *expand* private lawsuits; it *limits* them.  It restricts the relief specified in § 3 to plaintiffs who proceed under "statutes that already allow for private lawsuits."  *Ark. State Conf. NAACP*, 86 F.4th at 1211.

Sections 12 and 14 provide even less support for Plaintiffs' position.  Section 12 merely confirms that federal district courts have jurisdiction over actions to enforce the Voting Rights Act.  52 U.S.C. § 10308(f).  True, § 12, like § 3, refers to suits brought by "a person asserting rights under the" Act, but, also like § 3, that reference does not *create* a cause of action for anyone.  It certainly does not do so unambiguously, *see In re Wild*, 994 F.3d at 1255, given that "the specific references throughout the other subsections of § 12 are to the Attorney General," *Allen v. State Bd. of Elections*, 393 U.S. 544, 555 n.18 (1969); *see also id.* ("[T]he question is not free from doubt.").

And Plaintiffs' § 14 argument hangs on the fact that it allows the court to award attorney's fees to "the prevailing party, other than the United States," in voting rights litigation.  52 U.S.C. § 10310(e).  According to Plaintiffs and DOJ, because the statute specifically excludes the United States, the term "prevailing party" must be referring to private plaintiffs, which must mean

they can sue. *See* Grant/Pendergrass.Br.56; DOJ.Br.46-47. But
that ignores the obvious fact that *defendants*—in this case, the
State—can be prevailing parties, too. *See, e.g.*, *Vaughan v.
Lewisville Ind. Sch. Dist.*, 62 F.4th 199, 203-06 (5th Cir. 2023)
(government defendants are entitled to attorney's fees under
§ 10310(e) if the plaintiff's lawsuit is frivolous); *Fox v. Vice*, 563
U.S. 826, 829, 832-33 (2011) (defendants are entitled to attorney's
fees under identical language in 42 U.S.C. § 1988(b)). And it
suffers from the same flaw as Plaintiffs' § 3 argument: § 14 doesn't
create a cause of action; it simply recognizes other causes of action
that already exist.

Lacking a persuasive argument in the text, Plaintiffs and
DOJ turn to legislative history. APA.Br.44;
Grant/Pendergrass.Br.56; DOJ.Br.46-47, 50. Namely, when
Congress amended the Voting Rights Act, there were committee
reports that assumed that § 2 is privately enforceable. *See, e.g.*,
S. Rep. No. 97-417 at 30 (1982).

Legislative history, however, is usually an unhelpful guide for
construing the plain terms of a statute. *See Exxon Mobil Corp. v.
Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). And Plaintiffs'
legislative history arguments are especially weak, for two reasons.
First, none of the legislative reports cited by Plaintiffs identify

38

anything in the actual language of the Act that supports a private cause of action for § 2.  The only report that speaks directly to the question simply makes a bald assertion about "the existence of a private right of action under Section 2."  S. Rep. No. 97-417 at 30. That is worth little in an inquiry that focuses on "text and structure."  *Sandoval*, 532 U.S. at 288.  Second, Plaintiffs and DOJ rely on committee reports from 1975, 1982, and 2006, APA.Br.44; Grant/Pendergrass.Br.56; DOJ.Br.46-47, 50, but "[p]ost-enactment legislative history … is not a legitimate tool of statutory interpretation."  *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011).

If a majority of Congress wished to create a private cause of action, then "why not say so in the statute?"  *Ark. State Conf. NAACP*, 86 F.4th at 1214.  Congress knew how to do so and *did* for the Attorney General.  Its choice not to do so for private parties should be respected.[5]

---

[5] Surprisingly, Plaintiffs assert that this Court should rely on Supreme Court cases inferring a private right of action in Title IX, Grant/Pendergrass.Br.57, but those cases cut against Plaintiffs.  The Supreme Court has on multiple occasions noted that it should *not* have inferred a private right of action in Title IX and that it would not continue the loose decisionmaking that had led it to do so there.  *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 77 (1992) (Scalia, J., concurring) ("[W]e have abandoned the expansive rights-creating approach

On precedent, Plaintiffs hang their hopes on *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996), but that decision did not consider whether § 2 is privately enforceable. True, it observed in dicta that courts "have entertained cases brought by private litigants to enforce § 2" on the way to holding that *another* part of the Voting Rights Act, § 10, is privately enforceable. *Id.* at 232. But the Court relied chiefly on its earlier holding in *Allen v. State Board of Elections*, 393 U.S. 544 (1969), that § 5 of the Act was privately enforceable. *See Morse*, 517 U.S. at 231-32.

Beyond *Morse*, Plaintiffs and DOJ offer little. As the district court did, they cite a number of cases that assumed § 2 provides a private right of action—and go so far as to argue for "stare decisis." APA.Br.38-41; Grant/Pendergrass.Br.51-54; DOJ.Br.48-50. But there is no such thing as stare decisis via "adverse-possession." *NLRB v. Noel Canning*, 573 U.S. 513, 570 (2014) (Scalia, J., concurring in the judgment). That courts and litigants have largely *assumed* a private right doesn't mean it has been silently decided. Opening.Br.62. This Court should decide it, on

---

exemplified by [the Court's Title IX decision in] *Cannon*."); *Sandoval*, 532 U.S. at 287; *Egbert*, 596 U.S. at 491 (both repudiating the Court's former practice of freely assuming causes of action).

the basis of the text, which conspicuously omits a private right of action.

## B.   Plaintiffs cannot proceed through § 1983.

The APA Plaintiffs argue that, even if they have no cause of action under § 2 itself, their claims can proceed through § 1983. APA.Br.37; *see also* DOJ.Br.41.  So, according to the APA Plaintiffs, this Court need not consider the availability of relief under § 2.  APA.Br.37.

As an initial matter, Plaintiffs forfeited this argument.  Their briefs never relied on § 1983 and the district court never ruled on § 1983.  They hardly put anyone on "notice" of this argument.

Regardless, § 1983 does not save their claims.  Federal statutes are enforceable through § 1983 only if (1) the statute unambiguously creates an individual right and (2) the statute does not have its *own* enforcement regime incompatible with § 1983.  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282, 284-85 & n.4 (2002).  Section 2 satisfies neither criterion.

First, § 2 does not unambiguously create an individual right. It doesn't create any new rights at all; it reiterates and guarantees the voting rights already created by the Fourteenth and Fifteenth Amendments.  *See* Alabama.Amici.Br.5-6.  Indeed, even if it wanted to, Congress couldn't use its enforcement powers under

those Amendments to create new rights.  *See City of Boerne*, 521 U.S. at 527 (Congress has no "substantive, non-remedial power" under the enforcement clauses); *Hibbs*, 538 U.S. at 727-28 ("[S]o-called prophylactic legislation" cannot "substantively redefine the States' legal obligations.").  Properly understood, the Voting Rights Act creates "new remedies," not new rights.  *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 315, 329-31 (1966); *see also* Alabama.Amici.Br.7-10.  Indeed, if Plaintiffs acknowledge that Congress *has* created a new right here, they are admitting that Congress went beyond its authority under the Fifteenth Amendment.

And § 2 does not create an *individual* right.  To do that, a statute "must be phrased in terms of the persons benefitted."  *Gonzaga*, 536 U.S. at 284 (quotation omitted).  But § 2 has no "individually focused terminology."  *Id.* at 287.  Instead, it imposes a "generalized duty on the State" to avoid discriminatory voting practices.  *Id.* at 281 (quotation omitted).  That's just like the Family Educational Rights and Privacy Act, which the Supreme Court in *Gonzaga* said *doesn't* confer individual rights.  *Id.* at 287; 20 U.S.C. § 1232g(b)(1).

At the very least, the question whether § 2 creates new individual rights "is unclear."  *Ark. State Conf. NAACP*, 86 F.4th

42

at 1209. And only statutes that "*unambiguously* confer individual federal rights" are enforceable through § 1983. *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 180 (2023).

Second, individual suits under § 1983 would conflict with the enforcement scheme established by the Voting Rights Act itself. Section 1983 enforcement is precluded when, inter alia, the relevant statute establishes its own enforcement scheme, *id.* at 189, or expressly authorizes a government official to "deal with violations," *Gonzaga*, 536 U.S. at 289-90.

Section 2 checks both of those boxes. The Voting Rights Act assigns responsibility for enforcing § 2 to the Attorney General, not private individuals. 52 U.S.C. § 10308(d). It gives the Attorney General a range of remedial options: "temporary or permanent injunction[s], restraining order[s], or other order[s]" compelling compliance from "State or local election officials." *Id.* It also provides a range of penalties, both civil and criminal. *See id.* § 10308(a)-(c). And § 3 gives courts even more tools to eliminate barriers to voting; it authorizes the appointment of federal observers and the suspension of voting tests when a § 2 claim prevails. *Id.* § 10302(a)-(b). "Congress," through this detailed and comprehensive scheme, clearly "intended to place

43

enforcement in the hands of the Attorney General rather than private parties." *Ark. State Conf. NAACP*, 86 F.4th at 1211.

It also makes perfect sense that § 2 includes no private right of action. The Fifteenth Amendment, which prohibits intentional discrimination, *can* be privately enforced (via § 1983). But § 2, which goes beyond the Fifteenth Amendment and could obviously be misused given its greater scope—and greater likelihood for reaching conduct that is, actually, perfectly legal—can be enforced only by the Attorney General. There are no gaps in coverage here: individuals can challenge intentional discrimination, and the United States can file prophylactic claims under § 2.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted.

<table>
<tr><td>

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Bryan F. Jacoutot
Diane F. LaRoss
  *Special Asst. Att'ys General*

Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
(678) 336-7249
btyson@taylorenglish.com

</td><td>

/s/ *Stephen J. Petrany*
Christopher M. Carr
  *Attorney General of Georgia*
Stephen J. Petrany
  *Solicitor General*
Paul R. Draper
  *Deputy Solicitor General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

</td></tr>
</table>

*Counsel for the Secretary of State of Georgia*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and the Court's May 7, 2024 order granting the Secretary's Motion for Additional Pages, *see* APA ECF No. 119, because it contains 8,983 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Bryan P. Tyson*
Bryan P. Tyson